**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL BRAGG,** | : | **CIVIL NO:3:10-CV-1287** |
| | : | |
| **Petitioner,** | : | **(Judge Nealon)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **GERALD ROZUM, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.      Statement of Facts and of the Case

#### A.      The Crime

The case of Michael Bragg presents the story of a commonplace crime committed by exotic means.

The story of this crime began late on the evening of February 18, 2004, at 11:30 p.m. when masked robbers broke into the apartment of Peter Santos, in Lebanon, Pennsylvania. Wielding a samurai sword, these robbers, whose features were concealed by bandanas, robbed, threatened and wounded Santos, who was left bleeding in his apartment. (Doc. 13-4, tr. 22-40.) While Santos could not observe the features of his assailants, on at least one occasion he advised police that he believed that at least one of his attackers spoke Spanish and may have been Hispanic. (Id., tr. 36.) Approximately one half hour later, at midnight on February 18, 2004, the

robbers, similarly attired and wielding a samurai sword, entered a local pizzeria and robbed the restaurant.(Docs. 13-4 and 13-5, tr. 42-50.)

Confronted with two sword-point robberies in the span of one hour, police mounted an investigation into these crimes. That investigation swiftly began developing a web of evidence identifying the Petitioner, Michael Bragg, and another man, Aaron Cass, as suspects in these robberies.

Indeed, in the early morning hours of February 19, 2004, forty-five minutes after the last of the two robberies occurred, local police stopped a car driven by Luis Natichia in which Cass and Bragg were passengers. (Doc. 13-6, tr.73-85.) Police briefly questioned Bragg and the other occupants of the vehicle that evening before releasing them. (Id.) That questioning led police to begin to focus suspicion upon Bragg and Cass. Thus, when police questioned the men regarding their activities and whereabouts that evening, they received inconsistent responses from Bragg and his confederates.(Id.) In addition, Bragg and Cass both had large sums of money in small denomination bills in their possession at the time of this stop. Bragg claimed that the money had been given to him by his girlfriend, Jamie Haney, who was an exotic dancer. (Id.) Yet, when Haney was later interviewed by police, she denied giving money to Bragg.(Doc. 13-11, tr.190-71.) Moreover, Bragg lied to police that evening regarding his true name, and identity, falsely identifying himself as "Jesse Bragg."

This deceit was discovered by police when they located Jesse Bragg and learned that he was the Petitioner's brother. Bragg's falsehoods regarding his identity heightened police suspicions regarding his activities.

Police also conducted an additional investigation, investigation which led to the recovery of physical evidence linking Bragg to this sword-wielding robbery. Thus, a witness, Nikki Krall, advised police that she had seen one of the robbers discard the samurai sword used in these crimes, tossing that sword into a nearby pond. (Doc. 13-8, 13-9, tr. 118-145.) Krall also testified that Bragg later threatened her, stating that he would harm her if she testified against him at trial. (Id.)

Acting on Krall's information, police recovered the sword. Later, an acquaintance of Bragg's, Martha Acevedo, identified the samurai sword recovered from the pond for police as a weapon that belonged to Bragg. (Doc. 13-8, tr. 110-118.)

In addition, surveillance videos of the pizzeria robbery identified one of the robbers as a man wearing a distinctive article of clothing, an Enyce brand denim jacket. After Martha Acevedo advised police Bragg owned such a jacket, (Doc. 13-8, tr. 110-118), police recovered the Enyce denim jacket from Bragg's girlfriend, Jamie Haney. When police recovered the jacket, they discovered that it was blood-stained. Subsequent DNA analysis revealed that the blood on the jacket included the blood of

Peter Santos, the man wounded in the first samurai sword robbery committed on February 18, 2004.(Doc. 13-14, tr. 76-79.) Bragg later admitted to police that this jacket, stained with the victim's blood, belonged to him. (Doc. 13-13, 13-14, tr. 53-85.) Police also recovered shoes belonging to Bragg's confederate, Aaron Cass. Those shoes were stained with Santos' blood, as well as the blood of an unidentified person. (Id.)

As the police investigation proceeded, additional witnesses came forward and implicated Bragg in these crimes. For example, Bragg's girlfriend, Jamie Haney, advised police that Bragg had admitted to her that he and Aaron Cass had used a sword to rob the pizzeria. Cass, in turn, was charged and pleaded guilty to his role in these robberies. (Doc. 13-11, tr. 168-186.) Cass, a drug addict, initially implicated Bragg in these crimes, but later testified that he was under the influence of drugs at the time of the robbery and was unable to recall who assisted him in these robberies.(Doc. 13-13, tr. 30-48.) Numerous witnesses, however, placed Cass in Bragg's company throughout the evening of February 18, 2004, when these crimes occurred.

One of these witnesses was Bragg himself. As part of this investigation, police also interviewed Bragg, who admitted during police interrogation that he and Cass were involved in the pizzeria robbery. (Doc. 13-13, 13-14, tr. 53-85.)In the course of

police interviews, Bragg further acknowledged that he had accompanied Cass and Luis Natichia to Peter Santos' home earlier on the evening of February 18, but claimed that the purpose this trip was an illegal drug purchase rather than robbery.(Id.)

Thus, by the time of his arrest Bragg was linked to these crimes through his ownership of the weapon used in the robberies, a samurai sword; though his own clothes, which bore blood stains of one of the victims; through the statements of various witnesses, who linked Bragg to these crimes and testified to admissions made by Bragg concerning the crimes; and through Bragg's own admissions, confessing to participating in one robbery and being present at the scene of another robbery when it occurred.

## B      State Trial and Post-Conviction Proceedings

Faced with this proof, Bragg initially entered a guilty plea, but then recanted, withdrew his plea and demanded a trial. That trial took place on November 7 and 8, 2005. (Docs. 13-4, 13-15.) At the close of this two-day trial Bragg was convicted of multiple counts of robbery, assault and conspiracy. Bragg insisted on proceeding directly to sentencing, and was sentenced to an aggregate 15-to 32-year term of imprisonment. (Doc. 1.)

Bragg appealed his conviction and sentence to the Pennsylvania Superior Court, challenging the sufficiency of the evidence tying him to the Santos robbery, and objecting to certain evidentiary rulings made in the course of the trial. On November 6, 2006, the Superior Court entered an opinion and order affirming Bragg's conviction and sentence.(Doc. 13-23.)

Following the conclusion of his direct appeal, Bragg timely filed a post-conviction relief petition (PCRA) with the state trial court. In this petition Bragg raised three claims which he now invites the federal courts to consider. First, Bragg argued that his state trial counsel was ineffective for failing to elicit testimony that the victim of the first robbery, had at one time stated that he believed that his assailants were Hispanic. Second, Bragg contended that his trial counsel had been ineffective in that counsel failed to file a motion to suppress relating to the February 19 car stop conducted by police. Third, Bragg asserted that his counsel had been ineffective at trial by failing to further pursue DNA analysis of the blood evidence obtained by police from the defendant's jacket and Cass' shoes. That evidence revealed that the blood of one known robbery victim, Peter Santos, was found on this jacket, which Bragg admitted belonged to him. Other blood, from an unknown source, was recovered along with Santos' blood from shoes that had belonged to Bragg's co-defendant, Aaron Cass. In his PCRA petition Bragg faulted defense counsel for not

further pursuing efforts to confirm the identity of the other person whose blood was recovered in this case.

Following the filing of this PCRA petition, the trial judge conducted a hearing on Bragg's motion. (Doc.13-17, 13-18.) At this hearing Bragg and his former counsel both appeared and testified. (Id.) Following this hearing, on September 24, 2008, and October 17, 2008, the trial judge entered two opinions and orders, denying this motion. (Docs. 13-21, 13-22.)

In these opinions, the court directly addressed each of the claims advanced by Bragg in his PCRA petition, and found them to be without merit. Thus, the court rejected Bragg's ineffectiveness claims based upon his counsel's alleged failure to file a timely suppression motion, noting that the delay in filing such a motion was in part due to Bragg's vacillation, since Bragg initially pleaded guilty and then only recanted this plea after the deadline for filing motions had passed. (Id.) Furthermore, the trial judge found that such a motion would have been unavailing in 2005, since some case law at that time indicated that a mere passenger in a car, like Bragg, may have lacked standing to object to a search of the vehicle.(Id.)

The court also denied Bragg's claim that his counsel was ineffective in failing to elicit testimony that the victim of the first robbery, Peter Santos, had identified his assailants as Hispanic. The trial judge rejected this particular ineffectiveness claim

as a factual matter, observing that defense counsel did , in fact, elicit testimony that Santos had identified his assailants as Spanish-speakers. (Id.)

Finally, the trial judge found that the failure of defense counsel to ascertain further information regarding the identity of the unknown person whose blood was found on shoes that belonged to another one of the robbers, Aaron Cass, was not ineffective assistance of counsel. As the court viewed it, what was probative about this proof was the fact that the blood of the first robbery victim, Peter Santos, was found on these articles of clothing, including a jacket that Bragg acknowledged belonged to him. Given the presence of Santos' blood on Bragg's clothing, the trial judge reasoned that further identifying the unknown blood that was found on a co-defendant's shoes clothes would not have materially aided the defense. (Id.) On the basis of these findings, the trial judge denied Bragg's PCRA petition, (id.), and Bragg appealed to the Pennsylvania Superior Court. (Doc. 13-24.)

On August 6, 2009, the Superior Court entered an opinion and order affirming the denial of this PCRA petition. (Id.) In its opinion, the Superior Court specifically found that Santos' contentions regarding the ineffectiveness of his trial counsel were without merit. In particular, the Superior Court agreed that a suppression motion relating to the car stop would have been unavailing on timeliness and standing grounds. The Superior Court further found that the untested DNA evidence in this

case would not have had a powerfully exculpatory impact in light of the undisputed fact that the blood of one victim was found on these blood stained clothes. Finally, the Superior Court determined as a factual matter that trial counsel for Bragg had presented evidence that Peter Santos had described his assailants as Spanish speakers. Since defense counsel had diligently pursued this issue at trial, the Superior Court rejected Bragg's claims that counsel was ineffective for failing to address this issue as a factual matter. (Id.)

Bragg sought Pennsylvania Supreme Court review of these claims of ineffective assistance of counsel, which was denied on March 10, 2010. (Doc. 1.) This federal habeas corpus petition then followed on June 21, 2010. (Id.)

### C.     __Bragg's Federal Habeas Petition__

In his federal habeas petition, Bragg now raises six claims of ineffective assistance of counsel, three of which have never been ruled upon by the state courts. These three claims, none of which have ever been addressed by the state courts, involve claims that: (1) Bragg's trial counsel were ineffective for failing to object to testimony elicited from police regarding suspicious behavior by Bragg at the time of the February 19, car stop; (2) that trial counsel should have requested a jury instruction concerning the evidentiary significance of a notarized statement signed by one trial witness, Jamie Haney; and (3) that trial counsel was ineffective for failing

to object at Bragg's sentencing to the imposition of an enhanced sentence based upon visibly possessing a weapon. (Doc. 1.)

In addition to these three claims, which are plainly unexhausted and unaddressed by the state courts, Bragg's federal habeas corpus petition renewed the three ineffectiveness claims that had been considered, and rejected, by the state courts. Thus, Bragg once again argued that his state trial counsel was ineffective for: (1) failing to elicit testimony that the victim of the first robbery, Peter Santos, had at one time stated that he believed that his assailants were Hispanic; (2) repeated his claim that his trial counsel had been ineffective for failing to file a motion to suppress relating to the February 19 car stop conducted by police; and (3) renewed his assertion that his counsel had been ineffective at trial by failing to further pursue DNA analysis of the blood evidence obtained by police from the defendant's jacket. That evidence revealed that the blood of one known robbery victim, Peter Santos was found on this jacket, which Bragg admitted belonged to him. The Respondents have filed a comprehensive response to Bragg's petition, (Doc. 13), and Bragg has allowed the time for filing a traverse to lapse. Therefore, this matter is now ripe for resolution.

For the reasons set forth below, it is recommended that Bragg's petition be denied, as both premature, in that it brings unexhausted claims, and meritless in that the claims that have been properly exhausted fail on their merits.

### III.    APPLICABLE LEGAL STANDARDS

### A.    State Prisoner Habeas Relief–The Legal Standard.

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> **(A)** the applicant has exhausted the remedies available in the courts of the State;
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

### (1.)    Substantive Standards For Habeas Petitions

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief. At the outset, a petition must satisfy exacting substantive standards to warrant relief. Federal courts

may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. See, e.g., Reed v. Farley, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Priester v. Vaughan, 382 F.3d 394, 401-02 (3d Cir. 2004).

## (2). Deference Owed to State Court Rulings.

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under §2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. §2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," see 28 U.S.C. §2254(d)(2). Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts. See Rice v. Collins, 546 U.S. 333, 338-39 (2006); see also Warren v. Kyler, 422 F.3d 132, 139-40 (3d Cir. 2006); Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C. §2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. See, e.g., Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam); Demosthenes v. Baal, 495 U.S. 731, 734-35 (1990).These deferential standards of review also guide our assessment of the legal claims concerning the effectiveness of counsel. Thus, any state court factual findings in this field are

presumed correct unless it can show by clear and convincing evidence that these findings were erroneous. Moreover, the state courts' decisions applying the Supreme Court's Strickland standard for assessing the competence of counsel must be upheld unless it can be shown that these decisions were either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. §2254(d)(1); or (2) were "based upon an unreasonable determination of the facts," see 28 U.S.C. §2254(d)(2). See, e.g., Roland v. Vaughn, 445 F.3d 671, 677-78 (3d. Cir. 2006) (applying § 2254(d) standard of review to ineffectiveness claim analysis); James v. Harrison, 389 F.3d 450, 453-54 (4th Cir. 2004)(same).

### (3.) Ineffectiveness of Counsel, The Substantive Standard

The Sixth Amendment to the United States Constitution recognizes the right of every criminal defendant to effective assistance of counsel. Under federal law, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive. Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that: (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 691-92 (1984). A petitioner must satisfy both of the Strickland prongs in order

14

to maintain a claim of ineffective counsel.  <u>George v. Sively</u>, 254 F.3d 438, 443 (3d Cir. 2001).

The first <u>Strickland</u> prong requires a petitioner to "establish first that counsel's performance was deficient."  <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir. 2001).  This prong requires a petitioner to show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment.  <u>Id.</u>  Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  <u>Id.</u>  However, "[t]here is a 'strong presumption' that counsel's performance was reasonable."  <u>Id.</u> (quoting <u>Berryman v. Morton</u>, 100 F.3d 1089, 1094 (3d Cir. 1996)).

Under the second <u>Strickland</u> prong, a petitioner "must demonstrate that he was prejudiced by counsel's errors."  <u>Id.</u>  This prong requires the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u>  "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> As set forth in <u>Strickland</u>, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness."  466 U.S. at 688.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). "However, [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quoting Strickland, 466 U.S. at 689). "It is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law are substantively consistent with the standard set forth in Strickland. See Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); see also Werts v. Vaugh, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent."). Accordingly, a federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254

may grant federal habeas relief only if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of Strickland. Billinger v. Cameron, 2010 U.S. Dist. LEXIS 63759, at *11 (W.D. Pa. May 13, 2010). In order to prevail against this standard, a petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); see also Waddington v. Sarausad, __ U.S. __, 129 S. Ct. 823, 831 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted). This additional hurdle is added to the petitioner's substantive burden under Strickland. See Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1420 (2009) (observing "the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard."); see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas.").

**(4).** **Procedural Thresholds for Section 2254 Petitions.**

**(a). Exhaustion of State Remedies and Procedural Default.**

Furthermore, state prisoners seeking relief under Section 2254 must also satisfy specific, and precise, procedural standards. Among these procedural prerequisites is

a requirement that the petitioner "has exhausted the remedies available in the courts of the State" before seeking relief in federal court. 28 U.S.C. § 2254(b). In instances where a state prisoner has failed to exhaust the legal remedies available to him in the state courts, federal courts typically will refuse to entertain a petition for habeas corpus. See Whitney v. Horn, 280 F.3d. 240, 250 (3d Cir. 2002).

This statutory exhaustion requirement is rooted in principles of comity and reflects the fundamental idea that the state should be given the initial opportunity to pass upon and correct alleged violations of the petitioner's constitutional rights. O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999). As the Supreme Court has aptly observed: "a rigorously enforced total exhaustion rule" is necessary in our dual system of government to prevent a federal district court from upsetting a state court decision without first providing the state courts the opportunity to correct a constitutional violation. Rose v. Lundy, 455 U.S. 509, 518 (1982). Requiring exhaustion of claims in state court also promotes the important goal of ensuring that a complete factual record is created to aid the federal courts in their review of a § 2254 petition. Walker v. Vaughn, 53 F.3d 609, 614 (3d Cir. 1995). A petitioner seeking to invoke the writ of habeas corpus, therefore, bears the burden of showing that all of the claims alleged have been "fairly presented" to the state courts, and the claims brought in federal court must be the "substantial equivalent" of those

presented to the state courts. Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992); Santana v. Fenton, 685 F.2d 71, 73-74 (3d Cir. 1982). A petitioner cannot avoid this responsibility merely by suggesting that he is unlikely to succeed in seeking state relief, since it is well-settled that a claim of "likely futility on the merits does not excuse failure to exhaust a claim in state court." Parker v. Kelchner, 429 F.3d 58, 63 (3d Cir. 2005).

While this exhaustion requirement compels petitioners to have previously given the state courts, a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," Picard v. Connor, 404 U.S. 270, 276 (1971), this requirement is to be applied in a commonsense fashion. Thus, the exhaustion requirement is met when a petitioner submits the gist of his federal complaint to the state courts for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional claims. Evans, 959 F.2d at 1230-33. Similarly, a petitioner meets his obligations by fairly presenting a claim to the state courts, even if the state courts decline to specifically address that claim. See Dye v. Hofbauer, 546 U.S. 1 (2005) (per curiam); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).

A necessary corollary of this exhaustion requirement is the procedural default doctrine which applies in habeas corpus cases. Certain habeas claims, while not

exhausted in state court, may also be incapable of exhaustion in the state legal system by the time a petitioner files a federal habeas petition because state procedural rules bar further review of the claim. In such instances:

> In order for a claim to be exhausted, it must be "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If a claim has not been fairly presented to the state courts and it is still possible for the claim to be raised in the state courts, the claim is unexhausted. . . .

> If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play. A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

<u>Carpenter v. Vaughn</u>, 296 F.3d 138, 146 (3d Cir. 2002) (citations omitted).

"[A] federal court will ordinarily not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus '[o]ut of respect for finality, comity, and the orderly administration of justice.' This is a reflection of the rule that 'federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds.'." <u>Hubbard v. Pinchak</u>, 378 F.3d 333, 338

(3d Cir. 2004) (citations omitted). Given these concerns of comity, the exceptions to the procedural default rule, while well-recognized, are narrowly defined. Thus, for purposes of excusing a procedural default of a state prisoner seeking federal habeas relief, "[t]he Supreme Court has delineated what constitutes 'cause' for the procedural default: the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Werts v. Vaughn, 228 F.3d 178, 192-193 (3d. Cir. 2000) (citations omitted). Therefore, when examining the second component of this "cause and prejudice" exception to the procedural default rule, it is clear that:

> With regard to the prejudice requirement, the habeas petitioner must prove " 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " This standard essentially requires the petitioner to show he was denied "fundamental fairness" at trial. In the context of an ineffective assistance claim, we have stated that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."

Id. at 193 (citations omitted).

Similarly, the "miscarriage of justice" exception to this procedural bar rule is also narrowly tailored, and requires a credible assertion of actual innocence to justify

a petitioner's failure to comply with state procedural rules. <u>Hubbard v. Pinchak</u>, 378 F.3d 333, 338 (3d. Cir. 2004).

Procedural bar claims typically arise in one of two factual contexts. First, in many instances, the procedural bar doctrine is asserted because an express state court ruling in prior litigation denying consideration of a habeas petitioner's state claims on some state procedural ground. In such a situation, courts have held that:

> A habeas claim has been procedurally defaulted when "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman v. Thompson</u>, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been "firmly established and regularly followed." <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). Whether the rule was firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, <u>Doctor v. Walters</u>, 96 F.3d 675, 684 (3d Cir.1996), because a petitioner is entitled to notice of how to present a claim in state court, <u>Ford</u>, 498 U.S. at 423-424, 111 S.Ct. 850.

<u>Taylor v. Horn,</u> 504 F.3d 416, 427-428 (3d Cir. 2007).

In other instances, the procedural bar arises, not because of an express state court ruling, but as a consequence of a tactical choice by a habeas petitioner, who elects to waive or forego a claim in the course of his state proceedings, and thus fails to fully exhaust the claim within the time limits prescribed by state statute or

procedural rules. In such instances the petitioner's tactical choices in state court litigation also yield procedural defaults and waivers of claims federally. See, e.g., Johnson v. Pinchak, 392 F.3d 551(3d. Cir. 2004) (procedural default when petitioner failed to timely pursue state claim); Hull v. Freeman, 991 F.2d 86 (3d. Cir. 1993) (same). Accordingly, a petitioner's strategic choices in state court waiving or abandoning state claims may act as a procedural bar to federal consideration of his claims, unless the petitioner can show either "cause and prejudice" or demonstrate a "fundamental miscarriage of justice". Id.

### B. Three of the Claims Advanced By Bragg Are Unexhausted and Must Be Dismissed

In this case Bragg's federal habeas corpus petition advances six separate claims of error by his trial counsel. Yet three of these claims have never been addressed in the state courts and are, therefore, plainly unexhausted. These three claims, none of which have ever been addressed by the state courts, involve claims that: (1) Bragg's trial counsel was ineffective for failing to that object to testimony elicited from police regarding suspicious behavior by Bragg at the time of the February 19 car stop; (2) that trial counsel should have requested a jury instruction concerning the evidentiary value of a notarized statement submitted by one trail witness, Jamie Haney; and (3)

counsel was ineffective for failing to object at Bragg's sentencing to the imposition of an enhanced sentence based upon visibly possessing a weapon. (Doc. 1.)

None of these specific claims has been addressed by the state trial or appellate courts, and there is no indication that these particular claims have ever been presented to those courts for their consideration. Given this fundamental failure to exhaust his state remedies, as to these claims Bragg's federal pleading is the very model of an unexhausted petition which the Court ordinarily should dismiss without prejudice, so that Bragg can either return to state court and totally exhaust his claims, or proceed in federal court on a petition which raises only wholly exhausted issues. Rose v. Lundy, 455 U.S. 509 (1982).

While Bragg has not requested a stay and abeyance in lieu of dismissal without prejudice, we have independently considered this issue, and have concluded that a stay in not necessary or appropriate in this instance. In reaching this conclusion, we recognize that such stays are not favored and in order to qualify for a stay and abeyance a petitioner should "satisf[y] the three requirements for a stay as laid out [by the United States Supreme Court] in Rhines: good cause, potentially meritorious claims, and a lack of intentionally dilatory litigation tactics." Heleva v. Brooks, 581 F.3d 187, 192 (3d Cir. 2009).

In this cases the issue of whether: (1) Bragg can show good cause; (2) the extent to which he can present potentially meritorious claims; and (3) the degree to which Bragg has engaged in dilatory litigation cannot be resolved by us on the current record. Therefore, we should refrain from making premature, and only partially informed, judgments on these issues. Instead, we should direct Bragg to litigate these claims fully in state court. Moreover, there is no showing that denying a stay will unfairly prejudice Bragg since it does not appear that the limitations period has run in this case. Therefore, permitting Bragg to fully litigate these unexhausted issues in the state forum promotes orderly review of these questions, and underscores the considerations of federalism which inform the exhaustion doctrine. Accordingly, this is a case where dismissal of the unexhausted claims in this petition, without prejudice, is appropriate.

### C.    Bragg's Exhausted Claims Lack Merit

In addition to these plainly unexhausted claims, Bragg's habeas petition advances three claims that have been addressed and exhausted in the state court system. These fully exhausted claims consist of Bragg's assertions that his state trial counsel was ineffective for: (1) failing to elicit testimony that the victim of the first robbery, had at one time stated that he believed that his assailants were Hispanic; (2) Bragg's repeated claim that his trial counsel was ineffective for failing to file a motion

to suppress relating to the February 19 car stop conducted by police; and (3)Bragg's renewed assertion that his counsel had been ineffective at trial by failing to further pursue DNA analysis of the blood evidence obtained by police from the defendant's jacket. That evidence revealed that the blood of one known robbery victim, Peter Santos, along with the blood of an unknown person, was found on this jacket, which Bragg admitted belonged to him.

While these claims are fully exhausted, and may, therefore, be addressed on their merits, we find that, with respect to each of these claims the legal and factual findings of the state courts are fully supported on the record, and are entitled to deference by this Court, deference which mandates the denial of these three claims on their merits. Each of these three claims is discussed separately below:

### 1.    <u>**Bragg Errs When He Asserts That Trial Counsel Did Not Present Evidence That the Victim of One Robbery, Peter Santos, May Have Identified His Assailants As Hispanic.**</u>

At the outset, Bragg errs when he contends that his trial counsel failed to elicit evidence that one of the victims of these robberies, Peter Santos, claimed to police that his assailants spoke Spanish and may have been Hispanic. Like every court which has considered this claim, we find that Bragg's argument fails as a factual matter since Bragg's trial counsel fully explored this matter in his cross-examination of Santos, and

elicited this evidence at trial. Since the trial record plainly reflects that Bragg's lawyer

did develop this defense, Bragg's contention that counsel was incompetent for failing

to present this evidence is simply incorrect, and the state court findings that this issue

was properly presented by Bragg's counsel at trial must be presumed to be correct. See

28 U.S.C. §2254(e)(1).

At bottom, Bragg's complaint is not that this issue was not presented to the jury

by his counsel, since plainly it was. Instead, Bragg's complaint seems to be that the

defense, while presented, was not ultimately persuasive to the jury. The mere fact that

a proffered defense failed to persuade, however, does not rise to the level of a

cognizable habeas corpus claim. Therefore, this contention fails on its merits.

### 2. Bragg's Counsel Did Not Err In Failing to Seek Further Investigation of the Highly Inculpatory DNA Evidence in This Case

Bragg's claim that his trial counsel erred by failing to seek further DNA analysis

of his blood-stained clothing also fails. At the outset, Bragg's current DNA argument

is confused and presents a claim that is factually somewhat different from the claim

litigated by the Petitioner in the state courts. In state court the parties acknowledged

that DNA testing confirmed that the blood stains on found Bragg's jacket came from

the blood of Peter Santos, one of the robbery victims. In the state court, Bragg

complained, however, that blood samples recovered from the shoes of his co-defendant Aaron Cass, contained both the blood of Peter Santos, and blood from an unknown individual. In the state proceedings, Bragg asserted that his counsel erred in not taking further steps to identify this unknown blood found on Cass's shoes. Now, in the current federal petition, Bragg insists that there was unknown blood, in addition to the blood of Peter Santos, on his jacket, and argues that trial counsel erred in failing to test this unknown blood further.

Regardless of where this unidentified blood was found on these various articles of clothing, the state courts have consistently rejected this argument by Bragg, reasoning that the exculpatory value of further blood testing in this case was minimal, given the undisputed fact that Peter Santos' blood was found both on Bragg's jacket and on Cass's shoes. Thus, focusing on what the testing had already shown, the state courts have found that counsel's failure to insist upon further testing, which could easily have resulted in the discovery of further inculpatory evidence, was not error,

These state court findings, in turn, are consistent with federal case law, which recognizes the dilemma that DNA testing of unknown samples can create for defense counsel. If counsel insists upon such testing by the government, counsel may actually develop additional highly inculpatory evidence linking criminal defendants to various crimes. Recognizing this dilemma, courts have held that the refusal to speculatively

seek out such testing, where the results could be damaging to the defense, is not error on counsel's part. See Grisby v. Blodgett, 130 F.3d 365, 372-73 (9th Cir. 1997).

In this case, the risks that such further testing might simply have underscored Bragg's guilt seem great. Defense counsel was aware that Bragg had already admitted to some involvement in these crimes in police interviews. Indeed, Bragg had pleaded guilty to these robberies but had later recanted his plea. In this setting, demanding further scientific testing of the jacket, which Bragg admitted belonged to him, was fraught with peril since initial DNA testing on the jacket had already identified the blood on that jacket as belonging to one victim, Peter Santos. In a case such as this, where the initial DNA testing that had been done was inculpatory in nature, but left some blood samples unidentified, defense counsel could reasonably conclude that further testing would not materially advance the defense and could, in fact, significantly harm the defense case by eliminating doubt regarding the provenance of this unidentified evidence. In such an instance, defense counsel could reasonably elect to leave an unidentified blood sample unidentified, and argue that the mystery surrounding the identity of the source of that blood created a reasonable doubt. See Grisby v. Blodgett, 130 F.3d 365, 372-73 (9th Cir. 1997).

### 3. Counsel Did Not Err in Failing to File a Suppression Motion

The state courts have also specifically and thoroughly addressed Bragg's final claim of ineffective assistance by counsel, his assertion that he was denied effective assistance of counsel by counsel's failure to file a timely suppression motion. The legal and factual findings made by the state courts are particularly apt here and compel denial of this claim. First, as a factual matter it is apparent that the delays in this case were caused, in large measure, by Bragg's decision to plead guilty and then later recant his guilty plea. These delays, caused by Bragg's vacillation, would have barred the filing of any suppression motion by trial counsel as untimely. Therefore, the state courts correctly concluded that it was Bragg's erratic actions, and not his counsel's indolence, that permitted the motions deadline to lapse.

Moreover, the state courts have also properly suggested that at the time of the trial of this case in 2005, it was uncertain whether Bragg, as a mere passenger in the automobile, would have had standing to challenge a search of this car. See Rakas v. Illinois. 439 U.S. 128 (1978). Therefore, to the extent that Bragg sought to suppress evidence taken in this traffic stop he might not have sustained a motion to suppress since he may not have been able to show standing to object to this search at the time of this trial. While we acknowledge that subsequent case law provided Bragg with a

greater opportunity to assert standing here, see Brendlin v. California, 551 U.S. 249 (2007), "under Strickland, we note that "in making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law." Sistrunk, 96 F.3d at 670 (quotation omitted)." Duncan v. Morton, 256 F.3d 189, 202 (3d Cir. 2001).Therefore, counsel cannot be faulted for failing to anticipate this legal development which occurred two years after this trial.

In addition, the trial record in this matter suggests that had a suppression motion been filed, the brief stop and detention of the vehicle and its occupants could have been sustained as an investigative detention based upon a reasonable, articulable suspicion. It is well-settled that a "reasonable suspicion standard applies to routine traffic stops." United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006). Further, although:

> "reasonable suspicion is a generally undemanding standard, a police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion to believe that an individual has violated the traffic laws. See Cortez, 449 U.S. at 416 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). And a reviewing court must consider whether the 'rational interferences from those facts reasonably warrant [the] intrusion.' Terry, 392 U.S. at 21, 88 S.Ct. 1868. Ultimately, our mandate is to weigh 'the totality of the circumstances-the whole picture.' Sokolow, 490 U.S. at 8, 109 S.Ct. 1581 (quoting Cortez, 449 U.S. at 417, 101 S.Ct. 690).

United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).

In this case, the trial record suggests that police might have met this burden of showing a reasonable suspicion had a motion to suppress been filed. At the time of the stop, police had received a report that two sword wielding men had robbed a pizza shop at midnight and then fled. This report led police to reasonably conclude that, in addition to the two male robbers, there was likely a third participant in this crime, a getaway car driver who facilitated their escape. Approximately forty-five minutes after the robbery, at nearly 1:00 a.m. on Wednesday, February 19, 2004, police observed a car with three men inside it traveling in the general vicinity of the robberies. Given the lateness of the hour, the temporal proximity of this event to the robberies, and the identity between the number of suspects sought and the number of men in the car, police had an articulable basis for briefly stopping the vehicle, and endeavoring to speak with its occupants. See United States v. Nelson, 284 F.3d 472 (3d Cir. 2002)(anonymous tip provided reasonable suspicion for 1:00 a.m. traffic stop).

Finally, we conclude that a suppression motion, even if successfully pursued, would not have materially altered the quantum of proof against Bragg at trial. This traffic stop elicited proof that Bragg was in the company of Cass on the night of the robbery, had money in his possession, and lied about his identity when questioned by police. However, even in the absence of this evidence, Bragg would still have been tied to this crime by the sword used in the robberies, which was identified as belonging to

Bragg. In addition, video surveillance showed one of the robbers wearing a distinctive brand of jacket which was identical to a jacket owned by Bragg. That jacket was recovered by police and bore blood stains containing blood of one of the robbery victims. Furthermore, Bragg confessed to assisting in one of the robberies, and being present at the scene of the other robbery.

In sum, Bragg's ineffectiveness claim premised upon the failure of counsel to file a suppression motion fails for four reasons. First, it was Bragg's vacillation, rather than any neglect by his counsel, that rendered any motion to suppress untimely. Second, as a passenger in the car, it was unclear at the time of his trial in 2005 whether Bragg had standing to move to suppress a search of the vehicle. Third, on the facts of this case, where police were looking for three men who were suspected of having committed a robbery, the brief stop and detention of this vehicle which had three men inside it, less than an hour after the robbery, in the general vicinity of the crime, at nearly 1:00 a.m. on a Wednesday morning, was supported by a reasonable, articulable suspicion. Finally, a suppression motion, even if successfully pursued, would not have materially altered the quantum of proof against Bragg at trial. Therefore, Bragg has not made out a valid claim of ineffective assistance of counsel relating to this suppression issue.

### 4. Bragg Cannot Show That Any of the Alleged Errors By Counsel Meet the Strickland Prejudice Standard

But even if we concluded that counsel's performance was in some way lacking, under Strickland a petitioner still "must demonstrate that he was prejudiced by counsel's errors." Strickland, 466 U.S. at 695 This prejudice showing requires the petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 695 "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. As the United States Court of Appeals for the Third Circuit has observed:

> In Strickland, the Supreme Court emphasized that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695. This is necessary because Strickland's prejudice prong requires a court to determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. See Flamer v. Delaware, 68 F.3d 710, 728, 730 (3d Cir.1995) (citing Lockhart v. Fretwell, 506 U.S. 364, 368-69(1993); Strickland, 466 U.S. at 695); Todaro v. Fulcomer, 944 F.2d 1079, 1085 (3d Cir.1991). A court simply cannot make this determination without considering the strength of the evidence against the accused. As the Supreme Court stated in Strickland, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696, 104 S.Ct. 2052. We note that *every* other circuit has also recognized that, in analyzing Strickland's prejudice prong, a court must consider the magnitude of the evidence against the defendant.

Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir.1999)(citations omitted).

In this case a dispassionate assessment of the strength of the case against Bragg leaves us convinced that none of the errors of counsel alleged by Bragg in his petition in any way meet this prejudice requirement by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 695.

Quite the contrary, as the state courts have repeatedly noted, the evidence marshaled here presented a compelling case against Bragg. At the outset, the weapon used in these robberies is a singular implement, a samurai sword, and Bragg was identified as the owner of this unique and distinctive tool of crime. Multiple witnesses placed Bragg in the company of a co-conspirator who pleaded guilty to these robberies, Aaron Cass, throughout the night of February 18, 2004, when the crimes occurred. One of the robbers wore a jacket that was identical to a jacket possessed by Bragg. When police recovered this jacket, a jacket that Bragg admitted he owned, they found blood stains on that jacket. Analysis of those blood stains revealed that the blood of one of the robbery victims, who was wounded by the samurai sword, was found on Bragg's jacket. Further, when police briefly stopped Bragg and his confederates less than an hour after the robberies. Bragg lied about his name, and provided police with a false

explanation for the large sums of small denomination bills that he possessed shortly after these robberies. Bragg later threatened to harm a witness, an act which is strongly indicative of consciousness of guilt. Moreover, Bragg admitted to others that he committed these crimes, and confessed to police that he participated in the pizzeria robbery and accompanied others to the Peter Santos' home that same evening, when Santos was robbed.

In sum, Michael Bragg's conviction on these charges was not the product of an unfair trial or inadequate counsel, as he suggests. Rather, when one examines the evidence it is apparent that Bragg's conviction is the consequence of his actions and choices, actions which left Bragg tied to his crimes by his unique choice of weapon to commit the crimes, by other physical evidence, by his victim's blood, and by his own statements.

### III.  <u>Recommendation</u>

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, and the Response in Opposition to this Petition, IT IS RECOMMENDED that the Petition be DISMISSED WITHOUT PREJUDICE as to Bragg's unexhausted claims, and DISMISSED WITH PREJUDICE on those claims that have been exhausted in state court. IT IS FURTHER RECOMMENDED that a certificate of appealability should not issue.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 10th day of December, 2010.

/s/ **_Martin C. Carlson_**
Martin C. Carlson
United States Magistrate Judge